Good morning, Your Honor. May it please the Court, my name is Sam Burchett and I represent the defendant below Appellant Bransen Energy. I want to start by discussing the materiality issue with regard to the issues of breach of contract. In my brief, I talked significantly about the percent of the non-conforming goods and I cited a case, a natural resources case that indicated that 7% was not a material breach of the contract. I wanted to point out, I also noted in my brief, I did a calculation with regard to the non-conforming goods of 43,000 tons and I did a calculation showing that that was right at 7% of the 600,000 tons delivered. What I failed to do, and I think it's important to note from this standpoint, is that the master agreement called for a pre-COD confirmation of 600,000 tons, but it also called for two post-COD confirmations requiring Bransen deliver 3 million tons. If you take the whole contract as a whole and you look at the 43,000 tons and you divide that by 3.6 million tons, the materiality issue becomes one of about 1.2% from a But you still breached the contract. Do you not concede that you breached the contract? Do not concede that I breached the contract. One of your, you didn't provide the coal that was required, right? You provided coal breeze. We provided coal breeze, Your Honor, that was a non-conforming good. We admit that it was a non-conforming good, but that was not a breach of the contract because 8.1 of the master agreement takes out the specifications and delivery of coal from breach of the contract. And it says very specifically 8.1 of the master agreement? 8.1 of the master agreement says very specifically that the delivery of coal that either does or does not meet the specifications is not an event of default, but rather it is a, it's exclusive remedy under the master agreement is the sections 5.1, 5.2, and 5.3. So if you had delivered instead of coal, shoes, just, you know, tons of shoes, you're saying that's not a breach of the contract. That's still a non-conforming. It doesn't meet specifications. It met most of the specifications as testified. If your shoes are hypothetical, if you delivered shoes instead of coal? It would not meet the specifications and it would be a non-conforming. That would not be a breach of contract? That would not be a breach of contract because the failure to deliver goods under the master agreement is very specific when it says accepted out of events of default is the delivery of coal. And so if coal that doesn't meet the specification or non-conforming goods that don't meet the specification is not a breach of the contract. All right. Because I had read that sort of differently as like, you know, if your coal is off by a little bit, maybe that's something we have to discuss. But if you deliver a shipment of shoes, there's nothing to talk about. The coke breeze was off by just a little bit. I thought coke breeze is not even coal. It's a coal product. It is. It's a coal product? Yeah. It's not what they needed. It's not what they contracted for. They contracted for coal that would work in the plant. Well, it met all of the specifications except for BTU and it was high on BTU. Right. So it's not what they contracted for. Well, every, again, that's the perfect tender rule. And we're not discussing perfect tender rule. Coal is not a homogenous product. You don't go to a mine and get every ton of coal that meets a specific specification. In fact, our expert witness indicated that there was virtually nowhere in southwestern Virginia where you could get the product of the specifications that they set forth. What you do is you deliver product and you blend it to meet the specifications. That's the way it's always been. I'm sorry. Can you go back and give me the site and the master agreement again for the ---- 8.1. Okay. Thank you. 8.1. And it says very specifically. Yeah, I'm looking at it now. Except for the delivery of coal, which the remedies are, if they didn't like it, they could reject it or they could adjust the price with regard to that amount. Mr. Rorty testified that they did none of it. Right. Where does it say except for the delivery of coal? 8.1 is pretty big with a lot of subparts. It's 8.1, little 2 on page 18 of the agreement that says, and except for seller's obligations to deliver coal pursuant to the specifications contained in the confirmation, the exclusive remedy. It doesn't say a possible remedy. It says the exclusive remedy for which is provided in 5.1, 5.2, and 5.3. But at least, just help me out, because at least as to the first claim, what is it, the Coke Rees claim, they're saying there was no delivery of coal. Right. They didn't deliver coal. They delivered a coal product, which is not coal. Your Honor, we delivered 601,000 tons of coal. The Coke Rees was delivered first to provide a base layer. It met the specifications as our expert witness indicated, and that it also provided a more porous layer because of the status of the site where the coal stockpile was to be. So whether it was two shoes. Can I just ask you a question? Yeah, let's go back to my shoes. You get this, they get this huge shipment of shoes, and you say they're thrown back onto Section 5 under which they're going to negotiate a different price. They're going to get a deduction in what they pay because they got shoes instead of coal. How can that possibly be? I just don't see how Section 5 could possibly apply in a case where you don't deliver coal at all. Okay. The Coke Rees met all the specifications. So you're fighting the premise here. You're saying Coke Rees is coal. It certainly is a coal product. But a coal product is not the same as coal, right? And if you will look at the run-of-mine coal definition in the confirmation, it provides for extraneous material as well. So you can say it's either coal or it's extraneous material, or you can say it's shoes, and sometimes shoes show up in some of this. It is within the parameters. So you're saying if you get shoes or non-coal, you get bumped to the part of the contract that is called quality adjustments? Yes. Like you want better shoes? It just makes no sense. Do you see what I'm saying? At least from a coming just from kind of a plain reading sort of a perspective, it seems like Article 5 is for if you need a quality adjustment. Coke Rees is coal, okay, that has been altered. And it is altered in order to take out the volatility. And there was no volatility requirement under these specifications. And so it met the ash requirement. It was slightly high on the BTU requirement. It met the sulfur requirement. So it can, and as indicated by Bish's declaration, it is being used and could be used in the V-Check plant after the permit revision. I don't know why you're, because you are pointing us to 8.1. Yes. And the remedies there don't provide for damages through 5.1. But that's, I don't know why you're struggling to say that you didn't breach with the delivery of coal. Because if you, it's only a breach based on your delivery of coal that throws you into 5.1, 5.2, and 5.3, where you wouldn't get damages. If you breached otherwise, they get damages. I don't see that. Well, it says the failure of the defaulting party to comply with any material obligation except for the delivery of coal, the exclusive remedy for which is provided for in 5.1, 5.2, 5.3. And coal is defined for the confirmation that we're discussing, which is run-of-mine coal contains any number of coal products. If you look at coal defined in the ---- Do you understand? If the way I'm reading it, if you breached based on delivery of coal, which is what they're saying you did, then wait, then I don't think you owe them damages. But you're saying ---- I say it says that they ---- All right. Then you do owe them damages. No, it says as an event of default is this business except the delivery of coal, which fails to meet the specifications. So this coal product did not meet the specifications. They didn't exercise any of their remedies under 5.1, 5.2, and 5.3 as testified by Rorty. And so there is no breach of the contract. Okay. As I read 8.1, the seller's obligation to deliver coal, that's you, right, the seller? And it has to be a material breach. Do you understand? Are you the seller of the coal? Are you? Yes. Okay. The seller's obligation to deliver coal pursuant to the confirmation, a breach for that, the exclusive remedy for that breach is 5.1, 5.2, and 5.3. That's what you ---- It doesn't say the exclusive remedy for that breach. It says the exclusive remedy for which ---- For which. For which. It takes it out of the events of default. It is not an event of default. Okay, then. They get damages. So I want to go back to the materiality. Putting all of that aside, and I agree with you on all of that, was 43,000 tons of whatever it was delivered a material breach? And for it to be a material breach, it has to be more than the case law says with regard to natural resources, something in the range of 7%. This was between 7% if you look at the product delivered of 601,000 tons or the product contracted for, the goods contracted for, which was 3.6 million tons. At 3.6 million tons, the materiality drops to about 1.2%. And on a cash basis or on a proceeds basis, we're looking at 110, 116 million tons versus $116 million versus about $1.9 million. I just want to make sure, just on a really simple level, I understand this argument. I mean, they needed the coal kind of when they needed it, right? It was time sensitive because they were trying to test this plant and get it up and running. So why in trying to figure out whether depriving them of that coal so that they were not able to meet their schedule and open on time, whether that was material or not, why would you also include some other coal that maybe they were going to order after the relevant time had passed? There were three confirmations, and one was before, and two for 3 million tons were after. Why would you look at the after ones? Because isn't their whole argument, we needed the right kind of coal to test this plant on schedule, and we didn't get it. So why would you be looking at coal that they might or might not have ordered after that time? Because it was all part of the master agreement. It was all part of the total tons contracted for. I feel like I'm not explaining my question right. Just as a matter of common sense, when you're trying to figure out whether the fact that instead of getting what they ordered, they got some stuff that they could not use to test their plant on the right date, whether or not that was a material breach doesn't seem to me to really turn, as a matter of common sense, on stuff that would or hypothetical things that might have happened after that critical date. Do you see what I'm saying? I understand that. Okay. But the contract was for 3 million, 3.6 million tons. And so whether it was 7 percent or 2 percent, it's still immaterial. It is not a material breach. Well, can I ask you one thing? If we assume that your client was in material breach of the contract, just assume that, where would we look for a remedy? Where would we look for a remedy in the contract? In the contract, it disclaims we both disclaim lost profits. And they asked for $9 million in diminution in value, which is essentially the drop in the price of coal. And that was we all agreed that we couldn't seek lost profits, as well as consequential or incidental. So I don't think there are any damages. I think that the contract says that there are. And they, for example, the $9 million in consequential damages was a consequence of them choosing not to use Mr. Peters after March of 2013. Now, I want to point out really in the short period of time that I have left that they have removed all the coal from the coal stockpile. So despite their allegations that it can't be used, they have removed 593,000 tons, judicial notice of the MCHA site. Number two is with regard to March the 26th of 2013, that was in my Skinner, Jeffrey Skinner affidavit. He indicated that in his conversations with Mr. Bowlin and Ms. Fry on March 26th that despite all of your discussions about breach and delivery and everything, well over two years after the delivery of the coal breeze, Dominion said, Dominion's counsel said to Ben Branson's counsel that Branson is not in breach, not in default, that all the contracts are current and they are to be prepared to continue to or commence deliveries under the post-confirmation agreements. So your red light is I'm giving you some time because you were questioned quite a bit on a very narrow, not narrow, but an opening, your opening point. But you have to wrap it up in about 30 seconds. Thirty seconds? Yes. Okay. So with regard to the coal, this all stems from their concocted theory that a rejection of a ready pile pursuant to the coal services agreement somehow constitutes a rejection of the entire 601,000, despite the fact that we already testified that there was no rejection. No one within Dominion testified that there was any rejection. The coal services agreement, which was, again, one of the agreements that was in full force, not canceled as of March 26th of 2013, their damages expert testified that there was no damages arising from that agreement. So if there are no damages from that agreement, that agreement could not be in default, and that's where the rejection of the ready piles, that they then take back to the rejection of the 600,000. Okay? Thank you, Counsel. Thank you. Mr. Hatch. Good morning. There's a lot of movement, so you want to go ahead. Good morning, Your Honors, and may it please the Court, Ben Hatch on behalf of Dominion Virginia Power. Branson's arguments on appeal largely ignore the plain terms of these contracts between the parties and the facts that were reduced below, both at the stage of summary judgment and at the bench trial that subsequently occurred in the findings that were made at that time. Those facts established that Dominion contracted for a specific product, run-of-mine coal meeting specifications, for a specific purpose, the performance testing of the new V-Check facility, and for a specific time. Obviously, prior to when that facility was to come online and needed to be tested. And for that, Dominion paid the good value that the contract called for of approximately $27 million. Run-of-the-mine coal, does that mean that it's 100% coal? No, Your Honor. Run-of-mine coal means it came directly out of the mine, and it's understood in the agreements provided that that will have a limited, is what the contract said, a limited amount of extraneous material, rock, that sort of thing. But it did not specify a percentage as to what limited mean, did it? It didn't specify a certain percentage. There was testimony at trial that what was delivered did not fall within an industry, that it was a significant amount. And I think, Your Honors, of course, there's a summary judgment in the trial, and we can address both. But the trial testimony, I think, very well clarified the issues, because Mr. Peters, the principal of Branson, testified that they delivered gob coal, garbage of bituminous. And so the only issue was he said that was run-of-mine coal. There was contrary testimony from their own other witness, Mr. Sutherland, but also, of course, from Dominion's witnesses, that run-of-mine coal, as used in the contract, as understood in the industry, is not gob coal. Gob coal equals waste coal, which was a different category. And so Judge Gibney found, based on the testimony he deemed to be credible, that those two were not equivalent. And so Branson's position at trial was that it delivered the wrong product, ultimately. I mean, its position was it admitted it delivered the garbage of bituminous coal, which was not what the contract called for. And so there's really two categories. Dominion paid that good value for run-of-mine coal. And what it got was 600,000 tons of product that was not what it ordered, about 43,000. So their breach was that they delivered coal that was not to the specifications contained in the confirmation. Is that right? That was part of the breach, Your Honor. And I'm glad the court raised that. This goes to the 8.1 portion of the agreement. Because if that's part of the breach, then the 8.1 provides the exclusive remedy for that, which does not include damages. Your Honor, what I would say to that is that argument to me is a bit of the tail wagging the dog. What 8.1 says, when it says failure to deliver coal pursuant to the specifications, is, and there were specifications and all of the 600,000 failed those specifications, that's for sure. But what that's talking about is when the failure is just a failure as to the specifications. And here the entire product was wrong. And that's what was found both at summary judgment and at trial. And where the court can look to the product. So it's a difference between, to go back to Judge Harris's analogy, you ordered black shoes and they delivered blue shoes. That would fall within 8.1. But if you ordered shoes and they delivered apples, then that falls outside of 8.1. Exactly. Or we ordered coal and, as they say, they could deliver us shoes because shoes burn. I mean, what that provision is talking about is you delivered me something that is a little bit off, a micro amount of adjustment. And one of the remedies you can elect under the contract is to make an adjustment in price for that relatively small amount, just as to BTU or ash. And, of course, we proved and was found this was out of spec in various ways beyond that. So that wouldn't even address it. But if the court looks to the first page of the pre-COD contract, what that says is, that's what I would call the macro, the product that is ordered. And there's three categories, coal, run of mine, and waste coal. Do you have a JA site for where I need to look? I certainly do, Your Honor. Thank you. The pre-COD, and I know the JA is a little bit large. The pre-COD contract is a JA 462. Okay. If Your Honor has that handy. I believe that's in the first volume. Okay. Does the court have that? Mm-hmm. Okay. And so this is the pre-COD contract. This is what was ordered. And you see there on the very first page, product, and there's those three categories. And run of mine coal is clearly different from waste coal, which is what they ultimately testified and acknowledged that they, excluding the Coke Breeze, which isn't any type of coal product at all, but they ultimately testified waste coal. And so my point to the court would be what 8.1 is saying is if you delivered waste coal and we'd ordered waste coal and maybe the BTUs were a little bit off, you can make an adjustment. But when you deliver the entire wrong product. That's a complete breach. That's a complete breach. And I would direct the court back to the master agreement, Section 8.8, which is what allows Dominion the direct damages that resulted from this breach. Okay. So for any provision for which there's no other remedy, that's a general provision that allowed Dominion to recover direct damages. And so that was the vehicle under the master agreement. To turn to some of the arguments presented today, first of all, this issue, to go back to Coke Breeze, which, of course, the record established isn't coal at all. It certainly is none of this product that was ordered. It came from a facility that was not the approved facility. And there's at times in the brief allusion, in Branson's brief allusions, that this could be naturally occurring. But this is where I say perhaps there's a deviation from the record, because it was established and agreed below that the 43,000 tons of Coke Breeze that was delivered came from a coking facility that was not an approved source. So there's no issue that whether that 43,000 tons came out of the ground along with coal. They didn't have a question. They say that you picked the site, correct, your client? The stockpile area. That was arranged, and there were contracts about that. Your client, correct? And them as well, yes, Your Honor. They agreed to manage that area. You were the lessee of that property. That's correct, Your Honor. So you were privy to it. So you were in charge of that. They're saying that because of the site and the problems with that site, they needed that layer of admittedly nonconforming product, as you say, it's not coal at all, as a layer because of the situation. That puts them in breach if they had this layer they put down, and then they said the rest of it was conforming except for some variation. How did we take that in terms of references of not delivering coal? That's like saying, well, these are knowledge about shoes. Well, we needed some shoes, for example, cobblestones to put down before that, but then after we did that because of the site, we gave you what you needed. Isn't kind of what this case is a little bit, at least with their vantage point? Can you address that? Yes, happily, Your Honor. So, first of all, I would just say that that argument, I believe, was not made below, that somehow Dominion breached by virtue of this failure to have an adequate base layer. No, that was not pressed, but it does factor into what was delivered to make it usable at their point. And so, secondly, when it wasn't argued, I would submit maybe it wasn't argued because if you review these lengthy contracts, as I'm sure the Court has, there's no obligation on Dominion to provide a base layer, a suitable. There's nothing in there. And then lastly, Your Honor, what I would say is let's assume that that's really what happened. Let's just take it in there, you know, in that line. Then you would put down a base layer and still deliver us the 600,000 tons of coal that we ordered. But what was clear in the record, and there's really no dispute, Mr. Peters admitted to this, was that they delivered that 63,000 tons and billed it as coal. And we paid it as coal. So it wasn't like they called us up and said, hey, this facility stinks. Can we work it out? You know, we need to charge for some gravel. This was billed as coal, put down as coal, and the fact that it was in that stockpile rendered it unable to be used in the testing or at V-Check at all at that time because the environmental permits forbade burning coke breeze. You're saying that, yeah, go ahead, the coke breeze was billed as coal. Yes, Your Honor, and there's no dispute about that. Every invoice, this is in the record, was billed as coal. Mr. Peters, in his own statement, admitted that they delivered it and that essentially he was sorry and that he owed Dominion about 50,000 tons of actual coal in replacement. So that would be my response to that, Your Honor. I was a little bit surprised. Can I ask another question about that? If we took the coal breeze out of it and said, okay, that was fine, they needed to do that to build the base layer, weren't they still in breach because of the gob? The whole 600,000 tons was nonconforming, part of it because it was coke breeze and the remainder because it was gob or waste coal and not run-of-mine coal and also did not meet this. I mean, it was entirely nonconforming. And that's, you know, in short why this is a material breach. Dominion paid $27 million for a specific product and got none of it. Where you're saying that they admitted that they improperly billed for the coke breeze, that's at JA 1257, where he says, quote, we accept full responsibility for having improperly charged appellee for the coke breeze. That's correct, Your Honor. I mean, Mr. Peters was very candid about it, what had happened. He was candid at trial that they didn't deliver, you know, he kind of tried to say, I think it was not maybe a different matter about whether it was actually run-of-mine coal, but he admitted it was the garbage of bituminous was the remainder of it. So there's some legal arguments that are made, but they're not built on the facts of this case. I was a little bit surprised to hear in the argument today that there was no concession, that even the coke breeze breached the contract because, frankly, at page 51 of their opening brief, I read that to concede that at least the $14,000 that Dominion had to pay to amend its permits with the environmental agency were damages flowing from the breach. And so I thought that matter had been conceded. But in any event, I would also say the argument was made that somehow this coke breeze was an incidental amount, and incidental particularly in light of all that could have been ordered pursuant to these contracts. And I would just say I think the natural reading of the contracts is that incidental means, and incidental is incidental to the product we ordered. So some of that rock that would come out of run-of-mine coal, that sort of thing. It doesn't mean that you can take, you know, about 7% of what was ordered and just, you know, put the shoes in there, to use Judge Harris's example, because shoes can burn. And that's basically what they did. And so I don't think that's, as the court found below, I don't think that's a reasonable reading of the contract. So out of that logic, you're saying that no matter how low and minuscule it is, if they put that in, it wouldn't impact whether or not it was material or not? Particularly not in this case, Your Honor, because what they put in was forbidden to be used at the facility. And they couldn't find a way to unmix it from the whole amount. So we couldn't burn the coke breeze under the permits. And we needed to start performance testing the facility in that time frame. This came to light in early 2012, and the facility commenced operations in July of 2012. So that was really the crunch period. And because they'd seeded this coke breeze in there, that entire stockpile could not be burned under the permits. And obviously Dominion needed to make provision to test that facility and get it online. And it proceeded to do so by mitigating its damages in various ways. I would like to say, turning to that damages matter, it was raised in the argument before that Dominion is somehow seeking lost profits. I think the record's clear that's not the case. Dominion wasn't reselling this coal to begin with. So I don't see how there's a profit value that was even in here. The amount that the diminished value that I think my fellow counsel referenced was that Dominion, in trying to use this coal in some fashion, and what was the coal, had to wash it and screen it and that sort of thing. And in doing so, there was so much extraneous material that many, many tons of this stockpile are not even burnable coal material. And so in washing it and doing that sort of thing in mitigation of damages, you lose a lot of the ultimate size that you paid for because it just wasn't even coal. Let me ask you a question about the damages. It's a record question. If I'm understanding right, your expert testified at trial, right, that he had amended some initial numbers and there was an amended report and that those were emailed maybe. But is the amended report somewhere in the record? My fellow counsel informs me I don't believe the amended report is in the record,  The expert was available for deposition with respect to those amendments before trial, and the opposing side, I believe, chose not to exercise that option, which is their choice. But I don't believe the amended report was in trial evidence in the record. But he did testify at trial. It was also clear, I would submit, this wasn't raised before, but that any issue about lost coal was not a part of the ultimate judgment of the court below. That was the first issue that Branson raised in its brief. And Judge Gibney was clear on the record that that had been removed from the case. Dominion wasn't pursuing that. And that wasn't a part of the damages. What happened was the expert then took that amount of coal and put it back into the calculations of the amount that needed to be washed, the amount that needed to be processed. And so there was a final number with respect to that. I would also say, with respect to the damages expert, that my fellow counsel said, I believe claimed, that he conceded that there was no breach of the services agreement. And respectfully, his testimony was that he wasn't opining on that. He was a damages expert. He had been asked to assume breaches of the agreement and just calculate damages flowing. And I think if the court looks at his testimony, he was clear he was not a legal expert. He wasn't weighing into the terms, just talking about the effects that it had had on Dominion. It was also raised that there was an e-mail exchange between counsel and that this was part of the Skinner affidavit by my fellow counsel. And I would just say this is a matter that is not in evidence in this case. These e-mails were sought to be admitted by Branson at trial. Judge Gibney concluded that they were settlement discussions between the parties and therefore inadmissible as evidence. So I think that those e-mails may actually be in the joint appendix because they were proffered as evidence, but they were not admitted. And in any event, I don't even, if one were to look at them, they did not concede that there hadn't been a breach. What happened here was, of course, as Chief Judge Gregory was saying, we had this lease for this facility. We had 600,000 tons of material and had to make provision to do something with that. And so there was a period where we were obviously engaging in discussions with Branson about whether this could be resolved and had to also, as part of that time, make provision to extend the lease on that facility. And so if Dominion had sought a termination immediately, then that separate agreement that created the lease on that 600,000 tons would have gone away and that amount would have been forfeited. And Dominion would have then been in a position of asking for damages of at least 27 million, the amount it paid for the coal, or what it was supposed to be, Rhonda Mine coal that it didn't get. If the court has no further questions, I will sit down. Thank you, counsel. Thank you. For those reasons, we would ask the court to affirm the decision below. To your question with regard to the issue of the 600,000 tons of coal delivered and Dominion taking the position that the quality wasn't what was, that the quality specifications and that it was gob coal and that it was therefore not Rhonda Mine coal is really a ludicrous argument because he has admitted and we admit that the coal freeze was not from an approved source. But he said that what he didn't say and what I can say specifically is that all of the coal with regard to other than the 43,000 tons, all the other coal was from approved sources. So their argument that it's not Rhonda Mine and that it was gob coal and therefore the whole thing should be rejected is completely false because Ben Bond, Greg Workman, and Ed Rorty all approved the sources for all of that 600,000 tons absent the 43,000. All of the sources were approved. They all knew where the coal was coming from. And it was not Rhonda Mine coal. It was not coal that came out of them. Okay, I'm sorry. Please. Okay. Excuse me for interrupting, but I have a question. Okay. He says that your client admitted during testimony that it was gob coal. It was gob coal from approved sources. Okay. Those sources approved from Dominion. Dominion said this Rhonda Mine coal is gob coal that has limited, limited as opposed to substantial extraneous material. So your client did admit that it was gob coal, but gob coal from an approved source. From an approved source, exactly. In your view, is there a difference between Rhonda Mine coal and gob coal? Absolutely. What's the difference? With regard to the definition, and I'm sticking to the definitions that are within the four corners of the document and not what some expert says. Within the definitions, and you'll find those, I think we referenced it at 462. I'm looking at it. Okay. It has three definitions of coal. Only one of which is marked Rhonda Mine coal. Right. Coal, if you'll look at the coal definition, it has very limited extraneous material and precludes processed coals such as synthetic fuels. Do you see that? Mm-hmm. Synthetic fuels drops out when you go to Rhonda Mine coal. Rhonda Mine coal has limited extraneous material and meets the specifications. And the third is waste coal, and waste coal recognizes that there would be substantial extraneous material. So it's not the fact that it's coal is not Rhonda Mine coal and coal is Rhonda Mine coal and coal is waste coal or gob coal. It's the definition. The Rhonda Mine coal was gob coal from approved sources with limited extraneous material. So Dominion raises the issue about sampling, and I want to point this out. The sampling was done by Branson throughout the deliveries and was provided to Dominion. They didn't reject the stockpile after they received that sampling. What he is talking about and what was presented at the trial was sampling done well after the fact of the delivery. And any time a coal stockpile sits there for a period of time, it's going to retain moisture and it's going to degrade. And so what they're saying is, well, yeah, he defaulted under the agreement because he didn't deliver Rhonda Mine coal, but it was clean coal right out of the mine. That's not what the definition says. It's limited extraneous material from approved sources. Let me ask you a question about how what you're saying now dovetails with the district court's findings of fact after a trial, a bench trial. I mean, it just sounds – are you saying that the findings that the district court made were sort of clearly erroneous, they just got that wrong? It did not follow the findings, the facts as presented. I agree. Yes. I'm sorry. You want us to reverse the district court because he didn't follow the facts as presented by you? Yeah. And which fact are you discussing? I'm just reading the district court's factual findings, and they just sound absolutely nothing like what you're describing here. He thought this was a material breach. He goes through your – He had to find out it was a material breach. Can I just finish? He goes through what he catalogued – what the court catalogued as your six objections, including run-of-the-mine coal is the same thing as waste coal. Your testing shows that this stuff was fine. If it's not fine, it wasn't your fault. And he says all of that is not true. I'm finding to the contrary. So what do you want us to do? If regard to the testing, we provided the testing, and all of that was submitted, and it showed that it did meet the qualifications, the specifications. He is saying that the specifications that were provided after the fact by Dominion did not. And my point is that under the contract, the only quality sampling that should be accepted is that pursuant to the contract, and Dominion pointed it out in their response brief on the issue of ready piles, that the sampling can only be done – the only sampling that should have been accepted was that done by Branson. And Branson's sampling on a daily basis showed that the coal from the sources approved met the qualifications, was not rejected. Okay? So you're saying, Mr. Burchard, that the gob coal is undisputed. This is a question, not a statement. Are you saying that all of the gob coal came from a source that was approved by Dominion? Absolutely. Except for the way the coal – the coke grease. The coke grease. Yeah, we know that. Right, because that wasn't even coal. That's undisputed. And that's undisputed in the record. Undisputed. Right, because the district court can't make a finding that's not there. Undisputed in the record. Here's a question I have, because I don't know the coal industries. Help me with this. There's a coal – whatever – coal facility. At a coal facility, once you approve the facility, is there a place where if I dig here, I get run of the mill? If I dig over here, I get the gob coal? Or is it like – because unlike shoes, men or women make shoes, but men and women don't make coal. It's a natural resource. So my question is, once you pick the space, is it you get what's in that mine, or is there some place in that mine where you could say, no, go over there to the left. That's run of the mill. And over here, down this way, I need to know that. Because that's what I think you're saying. Once you approve it, you get what you get. Exactly. I'm not answering that question. That's the question to you. Is that right? You get – well, all of these sources that were approved, none of them were producing mines. And Dominion has tried to parse this into saying we contracted for coal coming directly out of the mine. None of that's true. They all contracted for waste or gob coal, but they wanted to test in the facility, because that's what that facility was intended for, was to use gob coal out of waste piles throughout southwest Virginia and eastern Kentucky. Did you just say they contracted for waste or gob coal? For gob coal, yes. Why is there an X on JA-462 at run of mine coal and not waste coal? Okay. I think the court is confused about this. Okay. Dominion did not approve. There was not proffered any source of coal coming directly out of a mine for the pre-COD. That did not happen. And the court seems to be confused about that. And so the experts sort of ran with that, and then somehow this is an admission from Mike that he produced gob coal. That's all that was asked for. We want gob coal. Waste coal. On JA-467, the president of Branson Energy signed this on January 26, 2011. Let Judge Thacker finish her question. And it's marked run of mine coal. Run of mine coal has to do with the quality, the amount of extraneous material. It does not mean that it was coming directly out of a mine. None of the approved sources by Dominion were coal that was being produced in 2011. Much of the coal was produced in the 1940s. This was coal coming out of waste piles, and it had to have limited as opposed to substantial. Some gob piles are cleaner than others. And so that's why they approved those sources. With regard to ‑‑I know I'm over time. With regard to ‑‑ You are proceeding at a question I asked, and I think you've answered mine. So I think you'll have to end here. Okay. I just wanted to say one thing about the March 26th. You haven't waived it anyway, but go ahead. Okay. It doesn't matter what the intentions were for Dominion with regard to March 26th. They said that Dominion, that Branson was not in breach, and, therefore, from the first breach standpoint, Dominion was the first to breach by announcing well before March 26th of 2013 that they would do no further business with Branson Energy. Dominion is the first to breach, and for that reason, we ask that the court overturn. All right. Thank you. Thank you. All right. I would say we're finished. I would look at the next one. We've got two more. All right. Do you want a break? We'll come down, greet counsel, and proceed to our next case.
judges: Roger L. Gregory, Stephanie D. Thacker, Pamela A. Harris